# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

LLOYD MACK ROYAL, III,

Defendant.

Criminal Action No. TDC-09-0048

Civil Action No. TDC-19-3359

## MEMORANDUM OPINION

Lloyd Mack Royal, III ("Royal"), a federal inmate serving a 30-year sentence, has filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. In the Motion, Royal collaterally attacks his underlying conviction on the basis that his trial counsel rendered ineffective assistance of counsel by failing to investigate the case adequately and call certain witnesses to testify at trial. Royal also challenges his sentence based on ineffective assistance of counsel at resentencing. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* Rule 8(a), Rules Governing Section 2255 Proceedings for the United States District Courts; D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be DENIED.

## BACKGROUND

On January 28, 2009, a federal grand jury returned a three-count indictment against Royal based on his perpetration of a violent sex trafficking and drug trafficking scheme that preyed upon victims under the age of 18. At the time of the primary charged crimes, during April and May 2007, the three primary victims—identified at trial as Melissa P., Stephanie T., and Ilana L.—were 17, 17, and 16 years old, respectively. In the Second Superseding Indictment, returned on June

24, 2009, Royal was charged with the following eight counts:   conspiracy to commit sex trafficking, during the period from April 2007 to May 2007, in violation of 18 U.S.C. § 371 (Count 1); three counts of sex trafficking, involving Melissa P., Stephanie T., and Ilana L., in violation of 18 U.S.C. § 1591 (Counts 2, 3, and 4, respectively); possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 5); conspiracy to distribute controlled substances, consisting of marijuana, cocaine, and PCP, during the period from September 2006 to May 2007, in violation of 21 U.S.C. § 846 (Count 6); distribution of cocaine to a person under age 21 (Stephanie T.), in violation of 21 U.S.C. § 859 (Count 7); and distribution of PCP to a person under age 21 (Melissa P.), in violation of 21 U.S.C. § 859 (Count 8).

## I.   Trial and Sentencing

During a six-day jury trial in March 2010, the evidence established that, in April 2007, Royal first met Melissa P., who was homeless and sleeping on park benches and in storage closets at the time.  The night they met, Royal gave Melissa P. marijuana and alcohol, and he had oral and vaginal sex with her.  Royal said he wanted to see if she was good enough to make money, and Melissa P. assented to sex because she "wanted a place to stay." 3/18/20 Trial Tr. at 40, ECF No. 113.

On April 15, 2007, Royal brought Melissa P. and her friend Stephanie T. to a room at a Motel 6 in Gaithersburg, Maryland, along with his cousin, Kureese Royal, and Royal's friend, Shantia "Honey" Tibbs.  At the Motel 6, Royal gave Melissa P. and Stephanie T. marijuana and alcohol, then forced them to strip naked and engage in oral and vaginal sex with him.  While there, Royal suggested that Stephanie T. consider prostitution.

Soon thereafter, Royal asked Tibbs to find potential customers to have sex with the victims, and Tibbs contacted an individual named Mark Witherspoon and, at Royal's direction, negotiated

2

a price of $250 for sex acts. Royal then had Tibbs and another friend, Angela Bentolila, assist the victims with their hair styling and makeup and provide them with sexually suggestive clothing to wear. While they were preparing, Royal used cocaine with Melissa P. and Stephanie T. Royal and Tibbs then brought Melissa P. and Stephanie T. to Washington, D.C. to meet Witherspoon, who paid the $250 to Tibbs, who then gave the money to Royal. Melissa P. and Stephanie T. then engaged in oral and vaginal sex with Witherspoon.

Later, Royal asked Melissa P. to contact her friend, Ilana L., whom he had seen on Melissa P.'s MySpace account. On May 8, 2007, Royal, accompanied by Melissa P., picked up Ilana L. and gave both victims phencyclidine ("PCP"), cocaine, and ecstasy. Royal then brought them to Tibbs's house, where Tibbs gave Melissa P. condoms and a dental dam. Royal then took Melissa P. and Ilana L. to a Holiday Inn in Gaithersburg, Maryland, where he had arranged for them to have oral and vaginal sex with another customer, Adam Grieder. At the hotel, Royal again gave PCP to Melissa P.

The next day, May 9, 2007, Royal drove Melissa P. and Tibbs to a Marriott Hotel in Gaithersburg, Maryland, where he again gave PCP to Melissa P. and had her engage in oral and vaginal sex with Grieder and had Tibbs perform oral sex on Grieder. At one point that evening, Tibbs asked Royal to stop giving PCP to Melissa P. "because her face was starting to turn green," but Royal told her "to shut the fuck up." 3/18/10 Trial Tr. at 157-158. On a different occasion, when Royal gave cocaine to Stephanie T. and she experienced a seizure, Royal refused to send her to a hospital because she was an intoxicated minor.

During the time period of these events, Royal used physical violence and threats against his victims. For example, he routinely beat Melissa P., held a knife to her throat, and threatened to "get" her little sister. *Id.* at 29-30, 97-98. In one instance, he anally raped her when he thought

3

she had been disloyal. On another occasion, Royal forced Stephanie T. to get out of a companion's car, drove her to a secluded lake, threatened her with a gun, beat her, and told her, "I'm like God. I decide who lives and who dies." 3/17/10 Trial Tr. at 180, ECF No. 112.

The evidence established that Royal also provided illegal drugs to Tibbs, Bentolila, and others. Ilana L. testified about an incident when Royal gave marijuana to her and Tibbs, and another when she witnessed Royal manufacturing crack cocaine. Tibbs similarly testified about another instance in which Royal provided her with marijuana. Bentolila, meanwhile, frequently purchased cocaine from Royal between November 2006 and May 2007, and, in January 2007, witnessed Royal deliver cocaine to her roommates. Royal eventually asked Bentolila to allow Melissa P. to live at her house, and she agreed because "she was trying to maintain a drug relationship." *Id.* at 98.

Thomas King, Bentolila's boyfriend, testified that in April and May 2007, he received drugs, including cocaine, from Royal, and he used cocaine with Royal, Melissa P., and Stephanie T. Likewise, Crystal Brown testified that, at some point before May 2007, she loaned money to Royal to purchase cocaine on the understanding that he would cook it into crack cocaine and sell it to repay her, and she subsequently accompanied Royal to New York, where he bought a large bag of cocaine.

Finally, Gaithersburg Police Department ("GPD") Sergeant William Best testified that on May 2, 2006 outside a 7-Eleven in Gaithersburg, Maryland, he witnessed Royal and another man, Mike Anderson, drive into the parking lot, get out of their car, and meet two other men, one of whom was Jermaine Johnson. Sgt. Best saw Royal engage in a hand-to-hand exchange with one of the men. GPD Corporal Chad Eastman testified that directly after the transaction, the police

4

detained Royal and recovered a bag of marijuana from Royal's waistband area, a bag of crack cocaine on the ground near Royal, and a bag of cocaine on the floor of the car in which he arrived.

On March 24, 2010, the jury convicted Royal on all counts. On Count Six, conspiracy to distribute controlled substances, the jury found that the conspiracy related to marijuana and cocaine, but not PCP.

On July 19, 2010, the Court (Williams, J.) sentenced Royal to a total term of imprisonment of 37 years, to be followed by 10 years of supervised release, including 30-year concurrent sentences on Counts 1-4 and Counts 6-8 and a seven-year consecutive sentence on Count 5.

Royal appealed his sentence to the United States Court of Appeals for the Fourth Circuit, which affirmed on August 10, 2011. *United States v. Royal*, 442 F. App'x 794, 801 (4th Cir. 2011) (per curiam). The United States Supreme Court denied Royal's petition for a writ of certiorari on January 17, 2012. *Royal v. United States*, 565 U.S. 1168 (2012).

## II.    Post-Conviction Proceedings

On January 15, 2013, Royal filed his first Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 ("§ 2255 motion") in which he challenged his conviction on the basis that he received ineffective assistance of counsel because his trial counsel did not advise him of his right to waive a jury trial and proceed by bench trial and did not provide requested material to Royal's appellate counsel. In his reply brief, Royal asserted additional grounds for his claim of ineffective assistance of counsel, including that his trial counsel:  (1) failed to call certain witnesses, including Jermaine Johnson, who would refute the testimony of the two police officer witnesses, Sgt. Best and Cpl. Eastman, about the May 2, 2006 drug transaction; and (2) failed to call a witness, Cierra Young, to refute the testimony of Eugene Melendez by showing that Royal was not present for acts allegedly committed at 522 Carousel Court in Gaithersburg, Maryland.

5

The Court found that these additional claims were procedurally barred as untimely and denied Royal's § 2255 motion. Royal again appealed to the Fourth Circuit, which dismissed the appeal on January 27, 2014. *United States v. Royal*, 667 F. App'x 26 (4th Cir. 2014) (per curiam). On October 6, 2014, the Supreme Court denied Royal's petition for a writ of certiorari. *Royal v. United States*, 574 U.S. 913 (2014).

On June 1, 2016, the Fourth Circuit granted an application by Royal for authorization to file a second or successive § 2255 motion on the grounds that *Johnson v. United States*, 576 U.S. 591 (2015), established a new rule of constitutional law applicable to his case. In the motion, Royal argued that his conviction for possession of a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c) had to be vacated because under *Johnson*, conspiracy to commit sex trafficking was no longer a crime of violence under § 924(c). The Government agreed, and the parties requested that Royal be resentenced on the remaining seven counts of conviction.

Royal received new counsel for resentencing, who presented new information regarding trauma and physical abuse that Royal had endured as a child. Based on this information and significant post-offense rehabilitation efforts, Royal's resentencing counsel argued that Royal should receive a lower sentence of 180 months of imprisonment and 10 years of supervised release.

On November 30, 2017, this Court resentenced Royal to a total of 360 months of imprisonment on the remaining counts. In so doing, the Court noted sentencing factors that favored Royal, including his lack of a serious prior criminal record, his traumatic childhood, and "admirable post-offense rehabilitation." 11/30/17 Sentencing Tr. at 83, ECF No. 176. The Court found, however, that the "horrific" nature of "taking three underage girls and forcing them into prostitution, giving them drugs, forcing them to take drugs," and "forcibly raping and sexually assaulting" them weighed substantially against Royal. *Id.* at 81. The Court also noted the

6

"profound," lasting impact on the victims, whose "emotional scars" had not healed even ten years later, and who continued to deal with mental health issues and drug addiction, among other challenges. *Id.* at 82. The Court concluded that a sentence of 360 months imprisonment, within the applicable guideline range under the United States Sentencing Guidelines, was warranted because, "on balance, the nature and circumstances of the offense do not leave room for a sentence lower than the guideline range." *Id.* at 86.

Royal appealed this revised sentence to the Fourth Circuit, which affirmed on November 6, 2018. *United States v. Royal*, 741 F. App'x 165, 167 (4th Cir. 2018) (per curiam). The mandate issued on November 28, 2018.

On November 22, 2019, Royal filed the present § 2255 motion ("the § 2255 Motion"). Although this is Royal's third § 2255 motion and raises certain arguments asserted but not decided on the merits in Royal's first § 2255 motion, this motion is timely and not successive because Royal filed it within one year of a new, final judgment. *See* 28 U.S.C. § 2255(f)(1) (2018); *In re Gray*, 850 F.3d 139, 142 (4th Cir. 2017) (holding that "when a prisoner's successful habeas petition results in a new, intervening judgment, the prisoner's first habeas petition to challenge that new judgment is not second or successive" even if it challenges the underlying conviction).

## DISCUSSION

In the § 2255 Motion, Royal argues that his conviction should be vacated because he received ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution, based on his trial counsel's failure to interview Royal's defense counsel in a state case and to interview and call as trial witnesses five specific individuals. He also argues that he received ineffective assistance of counsel at resentencing because his new attorney failed to

7

argue for a lower sentence based on his trial counsel's ineffectiveness and prevented him from criticizing the victims and other witnesses during the resentencing hearing.

## I.    Legal Standards

A prisoner in federal custody may move to vacate, set aside, or correct a sentence on the basis that: (1) "the sentence was imposed in violation of the Constitution or laws of the United States"; (2) the sentencing court lacked jurisdiction; (3) the sentence exceeded the maximum authorized by law; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The prisoner bears the burden of proof and must establish the claim by a preponderance of the evidence. *See Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958). In § 2255 proceedings, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). A hearing is necessary where there are disputed issues of fact that need to be resolved in order for the court to rule on the motion. *See United States v. Witherspoon*, 231 F.3d 923, 927 (4th Cir. 2000). "If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts.

The Sixth Amendment affords a criminal defendant the right to "Assistance of Counsel." U.S. Const. amend. VI. The Supreme Court has stated that "assistance which is ineffective in preserving [the] fairness [of a trial] does not meet the constitutional mandate." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). A defendant alleging ineffective assistance of counsel in violation of the Sixth Amendment must meet the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this standard, the defendant must show both deficient performance and

prejudice. Deficient performance has occurred when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. On this issue, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. When evaluating an attorney's strategic decisions, the court should be "highly deferential" to the attorney's judgment and avoid hindsight. *Id.* at 689, 691. Counsel has the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. However, while *Strickland* requires counsel to "conduct a reasonable investigation into potential defenses," it does not oblige counsel to "uncover every scrap of evidence that could conceivably help their client." *Green v. French*, 143 F.3d 865, 892 (4th Cir. 1998), *overruled on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000). The court should keep in mind that "what the lawyer did not miss is 'just as (or more) important as what the lawyer missed'" in evaluating the effectiveness of counsel. *United States v. Roane*, 378 F.3d 382, 411 (4th Cir. 2004) (quoting *Coe v. Bell*, 161 F.3d 320, 342 (6th Cir. 1998)).

Deficient performance causes prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When a defendant cannot meet the prejudice requirement, a court need not consider whether there was deficient performance. *Fields v. Att'y Gen. of the State of Md.*, 956 F.2d 1290, 1297 (4th Cir. 1992).

## II.    Ineffective Assistance of Trial Counsel

Royal asserts that his trial counsel provided ineffective assistance of counsel because he failed to conduct interviews of his former defense counsel and certain witnesses, which would

have enabled him to call five specific witnesses who could have provided exculpatory evidence or testimony that would have impeached certain Government witnesses. Specifically, Royal asserts that his trial counsel should have interviewed his former defense counsel, Gwyn Hoerauf, who would have directed him to interview Jermaine Johnson. He also asserts that his trial counsel should have interviewed and called as trial witnesses Johnson; Cierra Young, his former girlfriend; Jason King, the brother of Bentolila's boyfriend; Glen Fair; and Summer Iskander.

When an ineffective assistance of counsel claim is premised on a failure to interview witnesses and offer their testimony, prejudice occurs only if it is "'reasonably likely' that their testimony would have caused a different result." *Hoots v. Allsbrook*, 785 F.2d 1214, 1220 (4th Cir. 1986) (quoting *Strickland*, 466 U.S. at 696). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

On this claim, the Court will not address trial counsel's performance because it finds that trial counsel's alleged failures did not prejudice the outcome. Because a determination of whether it is reasonably likely that the investigation and witness testimony referenced by Royal would have changed the outcome of the trial depends on the strength of the evidence actually presented to establish the convictions on the remaining counts, the Court first outlines that evidence before considering the specific additional testimony that Royal claims would have been presented had his trial counsel conducted the interviews of the identified individuals.

A.      **Trial Evidence**

At trial, the Government presented 19 witnesses, consisting of 7 law enforcement witnesses and 12 other witnesses. These witnesses included the three victims; two of Royal's co-conspirators in the sex trafficking operation, Tibbs and Bentolila; Royal's cousin, Kureese Royal; two customers of Royal's sex trafficking operation, Witherspoon and Anthony Caban; three

10

individuals involved in Royal's drug distribution activities, Thomas King, Brown, and Melendez; and Sgt. Best and Cpl. Eastman of the Gaithersburg Police Department. Royal's trial counsel presented one witness, Royal's mother, Harri Dean Cox.

### 1.    Sex Trafficking

Pursuant to the undisputed jury instructions, in order to prove the crime of sex trafficking, 18 U.S.C. § 1591(a), as charged in Counts 2, 3 and 4, the Government was required to establish that Royal:   (1) either "knowingly recruited, enticed, transported, or obtained a person," or "knowingly benefited financially" from participating in a venture that recruited, enticed, transported, or obtained a person; (2) either knew that "force, fraud, or coercion" would be used to cause the person to engage in a commercial sex act, or knew that "the person was under the age of 18 years and was caused to engage in a commercial sex act"; and (3) took actions as part of this venture in or affecting interstate commerce, such as acts or transactions that were "economic in nature" and crossed "state lines." 3/24/10 Trial Tr. at 52-53, 61, ECF No. 116; Leonard B. Sand *et al.*, 2 Modern Federal Jury Instructions (Criminal) ¶ 47A.03 (2020); *see also United States v. Evans*, 476 F.3d 1176, 1178-79 (11th Cir. 2007) (finding the interstate commerce element satisfied where, although the criminal conduct occurred only within one state, the defendant used hotels "that served interstate travelers" and condoms that had traveled interstate).

There was substantial evidence that Royal recruited or obtained the victims to engage in commercial sex acts, and that he benefited financially from that activity. Tibbs, Bentolila, and Kureese Royal all testified that Royal discussed with them his intention to arrange prostitution involving the victims, including "talking about pimping the girls out" and stating that "he was going to make money off of them." 3/19/10 Trial Tr. at 96, ECF No. 114. In their testimony, the victims described incidents in which Royal proposed or arranged for them to engage in

11

prostitution. The three victims, Bentolila, and Tibbs all provided consistent testimony about the specific sex trafficking incidents with Witherspoon in Washington, D.C., and with Grieder at the Holiday Inn and the Marriott in Gaithersburg, Maryland, by providing similar accounts of the events, participants, and spaces. On the issue of financial benefit, both Tibbs and Witherspoon testified that Witherspoon paid $250 for sex with Melissa P. and Stephanie T., and Melissa P. and Ilana L. testified that Royal required Grieder to pay for individual sex acts with them, while Tibbs testified that Royal received the money paid for sex. The testimony was further corroborated by documentary evidence, including hotel receipts in the name of Royal and Grieder, as well as phone records. In addition to the incidents involving Witherspoon and Grieder, Anthony Caban testified that Royal offered him sex with Melissa P. in exchange for money and said that Caban "owe[d]" him after Caban received oral sex from Melissa P. 3/16/10 Trial Tr. at 60-62, ECF No. 111. Melissa P. testified that she engaged in this activity at Royal's direction because she was "terrified" of Royal. 3/18/10 Trial Tr. at 85-86.

There was also substantial evidence that Royal coerced the victims into engaging in prostitution, including Melissa P.'s testimony that he held a knife to her throat multiple times and threatened her with a gun that if she left him he would "shoot me right here and throw me into the ditch and that I was his forever," and Stephanie T.'s testimony that he showed her a gun and told her, "I'm like God. I choose who lives and who dies." *Id.* at 97-98; 3/17/10 Trial Tr. at 180. Bentolila, Tibbs, Melissa P., and Ilana L. all provided testimony that Royal plied the victims with illegal drugs before sex acts with customers. As for the victims' ages, Melissa P., Stephanie T., and Ilana L. all testified that they told Royal that they were under the age of 18. Where Royal's activities included driving the victims to engage in prostitution in both Maryland and Washington, D.C., there was no dispute that the interstate commerce element was established.

As for the conspiracy to commit sex trafficking charge, which required proof that there was an agreement between two or more persons to commit this unlawful activity, that Royal knowingly and willfully became a member of the conspiracy, and that there was an overt act to further an objective of the conspiracy, *see United States v. Vinson*, 852 F.3d 333, 352 (4th Cir. 2017), there was ample evidence that Royal engaged in this activity with others, including Tibbs, who testified that she solicited Witherspoon for sex with Melissa P. and Stephanie T. because Royal had told her he would pay her for doing so, and Bentolila, who testified that at Royal's direction, she housed Melissa P., and she prepared her for commercial sex acts by providing clothes and hair styling.

### 2.    Distribution of Controlled Substances

Counts 7 and 8, charging Royal with distribution of a controlled substance to a person under the age of 21, 21 U.S.C. § 859, required that Royal knowingly "distributed the narcotic" to a person who he knew "was under 21 years of age." 3/24/10 Trial Tr. at 84; *see United States v. Durham*, 464 F.3d 976, 980-81 (9th Cir. 2006).

The evidence on Count 7, distribution of cocaine to Stephanie T., included the testimony of Stephanie T., Bentolila, and Thomas King, all of whom described an incident at the residence of Bentolila and Thomas King—704 Clifftop Drive, Gaithersburg, Maryland—when Royal provided cocaine to Stephanie T., and she experienced a seizure. For Count 8, distribution of PCP to Melissa P., she, Ilana L., and Tibbs all testified about incidents when Royal provided PCP to Melissa P., including at the Holiday Inn, an apartment complex known as the Canterbury Apartments, and the Marriott. As discussed above, the evidence established that Royal knew that Stephanie T. and Melissa P. were under 21 years of age. *See supra* part II.A.1.

Count 6, conspiracy to distribute controlled substances, 21 U.S.C. § 846, required that Royal had knowingly joined an unlawful agreement between two or more persons to distribute or

13

possess with the intent to distribute marijuana, cocaine, or PCP between September 2006 and May 2007. As previously stated, in convicting on Count 6, the jury specifically found that the conspiracy involved cocaine and marijuana, but not PCP. In addition to the evidence discussed above relating to the distribution of cocaine and PCP to the victims, Brown testified that sometime before May 2007 she and Royal purchased cocaine together, and that Royal divided it up at Brown's residence—19224 Misty Meadow Terrace, Germantown Maryland—with the plan that Royal would sell it and provide a share of the proceeds to Brown. Thomas King testified that before April 2007, he bought cocaine from Royal on multiple occasions at Brown's Misty Meadow Terrace residence; and Bentolila testified that Thomas King made a phone call to arrange for her to purchase cocaine from Royal, which she did regularly from November 2006 to May 2007. Finally, Ilana L. testified that she saw Royal and Kureese Royal cooking crack cocaine in the Canterbury Apartments.

As for marijuana, Ilana L. testified that at 704 Clifftop Drive, Royal provided marijuana to Tibbs, who rolled it for the three of them to smoke, and Tibbs recounted an incident at the Motel 6 when she rolled marijuana at Royal's instruction as well as another incident when Royal gave her marijuana at 704 Clifftop Drive. Brown testified that she purchased marijuana from Royal in September 2006, and Kureese Royal testified that he saw Royal sell marijuana during the period when he and Royal were residing at 522 Carousel Court, but he did not testify about where those transactions occurred. Further, Eugene Melendez testified that he saw Royal, while at 522 Carousel Court, take marijuana from large bags, weigh it, and repackage it into smaller ones. Finally, the evidence included the testimony of Sgt. Best about the hand-to-hand transaction between Royal and Jermaine Johnson, and Cpl. Eastman's testimony about the recovery of bags of marijuana, cocaine, and crack cocaine on or near Royal immediately after the exchange.

14

### B.     Gwyn Hoerauf

As a first example of ineffective assistance of counsel, Royal asserts that he asked his trial

counsel to contact Gwyn Hoerauf, who had been Royal's defense counsel in a state prosecution,

but trial counsel failed to do so.   Royal argues that Hoerauf would have provided "valuable

information to impeach" Sgt. Best's testimony about the May 2, 2006 incident, apparently by

connecting trial counsel to Jermaine Johnson. 2255 Mot. at 10, ECF No. 186-1.   According to

Royal, Johnson, who was involved in the transaction, would have identified a different person—

someone named Mike—as his marijuana dealer that day.   Royal also asserts that his state counsel

would have "provided valuable insight into the incident" but does not explain how such insight

would have improved his defense at trial.  *Id.* at 15.

Even if Johnson had provided the testimony described by Royal, it is not reasonably likely

that the jury would have reached a different verdict. First, all of the sex trafficking counts, as well

as the two counts for distribution of a controlled substance to a person under 21, involved acts and

witnesses unrelated to the May 2, 2006 incident about which Sgt. Best testified.   Second, where

the evidence at trial established that Royal's companion on May 2, 2006 was named Mike—Mike

Anderson—Johnson's proffered testimony would not have changed the fact that Royal and

Anderson were together during that transaction, and that immediately after the encounter Cpl.

Eastman found a bag of marijuana on Royal's person and bags of cocaine and crack cocaine near

him, all of which supports a finding that, even if Royal did not actually hand over the marijuana,

he was part of a conspiracy to distribute it.  Third, even if Johnson's testimony could have caused

the jury to discount the evidence relating to the May 2, 2006 transaction, that incident was only

part of the evidence that Royal was engaged in marijuana distribution and, more importantly, it in

no way undermined the separate, extensive evidence about Royal's participation in a conspiracy

to distribute cocaine, which was alone sufficient to support the conviction on Count 6.   Trial counsel's alleged failure to contact Hoerauf therefore did not prejudice Royal's conviction.

### C.     Cierra Young

Royal also argues that if his trial counsel had contacted and interviewed Cierra Young, Royal's former girlfriend, "he would have learned that she did not move to the 522 Carousel Court residence in Gaithersburg" until late May 2007, and that Young's lease for that residence did not begin until May 19, 2007.   *Id.* at 10-11.   With this information and records showing that Royal was in custody from May 18 to July 9, 2007, Royal argues that trial counsel could have impeached testimony by Melissa P. and Melendez that Royal committed certain acts at 522 Carousel Court before May 2007.

This argument fails for several reasons. First, the lion's share of the evidence at trial related to acts occurring at other locations.   All of the incidents of prostitution involving the victims underlying the sex trafficking charges occurred at other locations, including the Motel 6, the Holiday Inn, the Marriott, and other residences.   Similarly, the incidents involving cocaine and PCP all occurred elsewhere.   The relevant events at 522 Carousel Court consisted of incidents of marijuana use or marijuana packaging and a single conversation in which Royal asked Melendez if he had contemplated paying for sex.   Thus, even without the evidence relating to 522 Carousel Court, it is not reasonably likely that the jury would have reached a different verdict on the sex trafficking  and drug distribution charges.

Second, Melissa P. identified only one incident, an encounter when she was beaten by Royal, that she recalls as having occurred at 522 Carousel Court.   The rest of her testimony described events at other locations and was substantially corroborated by other witnesses.   Even if

the jury had disregarded the one act that Melissa P. placed at 522 Carousel Court, it is not reasonably likely that the jury would have rejected the remainder of her well-supported testimony.

Third, as for Melendez, he testified that when he lived across the street from 522 Carousel Court and while Cierra Young and Royal were living there, he smoked marijuana there, witnessed marijuana repackaging there, and once discussed prostitution with Royal there. On cross examination, however, Royal's trial counsel challenged this testimony on the basis of timing, by causing Melendez to commit to the position that these events occurred in late 2006, but also while Cierra Young and Royal were both living at 522 Carousel Court.

Similarly, after Kureese Royal testified that, when he was living at 522 Carousel Court, he saw Royal sell marijuana, trial counsel forced Kureese Royal to admit on cross examination that he was "not clear of the dates when" the sales occurred, 3/19/10 Trial Tr. at 100, and to agree that the events occurred after Young moved into the residence. Royal's trial counsel then elicited testimony from Cox, Royal's mother, that Royal started living at 522 Carousel Court in October or November 2007, and that Kureese Royal moved into the residence after Royal did. The Government then cross-examined Cox and questioned her on whether Young's lease for 522 Carousel Court started on May 19, 2007, with *pro rata* payments starting the day before. During his closing argument, Royal's trial counsel built on these exchanges to argue that the acts Melendez and Kureese Royal ascribed to Royal at 522 Carousel Court could not have occurred during the time periods referenced in the indictment because Royal was in police custody starting on May 18, 2007, and the evidence established that Young did not move into that location until on or after May 19, 2007.

Royal's trial counsel thus used the cross examination of Melendez and Kureese Royal, and the testimony of Cox, to establish the very point that Royal asserts would have been established

through Young's testimony. The record demonstrates that trial counsel knew when Young moved into 522 Carousel Court and used that knowledge effectively to show that the incidents testified to by Melendez and Kureese Royal could not have occurred before May 2007. Where the jury convicted Royal despite trial counsel's development of and emphasis on this point, it is not reasonably likely that additional information about the date when Cierra Young moved into 522 Carousel Court would have led to a different outcome. *See Tucker v. Ozmint*, 350 F.3d 433, 445 (4th Cir. 2003) (finding no prejudice where defense counsel failed to use one method to impeach a witness but still highlighted flaws in the witness's testimony during closing arguments).

**D.    Jason King**

The third witness that Royal asserts his trial counsel should have interviewed and called as a witness is Jason King, the brother of Bentolila's boyfriend, Thomas King. According to Royal, Jason King would have testified about how Royal met Bentolila "and how manipulative and controlling she was." 2255 Mot. at 9 n.5. Royal does not explain how such testimony would have affected his trial. Construed liberally, such testimony arguably would have been offered to cause the jury to distrust Bentolila or place more responsibility for the crimes on her.

Even without such testimony, however, Royal's trial counsel elicited comparable, compelling testimony that Bentolila was controlling and abusive. During cross examination, Bentolila admitted that she was "a person who likes to be in control," 3/17/10 Trial Tr. at 122, 133, had told investigators that she "didn't like it" when she was "being challenged by anyone," *id.* at 141, and frequently used cocaine while her child was home. Trial counsel also elicited testimony from Thomas King that Bentolila was "strong-willed" and "in control." 3/23/10 Trial Tr. at 57, ECF No. 115. In addition, Melissa P. testified on direct examination that living with Bentolila was "hell" because Bentolila would lie to get her in trouble with Royal, lie to get Royal to hit her, and

18

hit her directly. 3/18/10 Trial Tr. at 81. In light of this testimony about Bentolila from multiple witnesses, including Bentolila herself, testimony from Jason King on this issue would have been cumulative and likely would not have changed the outcome of trial, particularly where the evidence supporting convictions on each count was far more extensive than Bentolila's testimony alone. *See Campbell v. Polk*, 447 F.3d 270, 284 (4th Cir. 2006) (finding that counsel's failure to present additional evidence at sentencing did not establish prejudice because that evidence would have been "largely cumulative").

> **E.     Glen Fair and Summer Iskander**

Finally, Royal asserts ineffective assistance of counsel based on the claim that his trial counsel did not return phone calls from Glen Fair or Summer Iskander, but he provides no information on their expected testimony and thus provides no basis upon which to conclude that their testimony would have affected the outcome of the trial. Thus, the Court cannot find that trial counsel's failure to interview or call them as witnesses caused prejudice.

In summary, a review of the record reveals that trial counsel's alleged deficiencies did not prejudice the outcome of the trial and thus do not establish ineffective assistance of counsel that warrants relief under § 2255. As the trial judge stated at the original sentencing hearing, Royal's trial counsel "did the best that he could under the difficult circumstances that were posed by this case." 7/19/10 Sentencing Tr. at 34, ECF No. 108.

**III.     Ineffective Assistance of Resentencing Counsel**

Royal also asserts that his resentencing counsel's performance was deficient because during the resentencing proceedings she did not highlight his trial counsel's ineffectiveness and forbade Royal from criticizing his "accusers" or questioning the accuracy of their accounts. 2255 Mot. at 17. He argues that if resentencing counsel had not been deficient in these ways, "there is

a reasonable probability that the Court would have imposed a lesser sentence" because he "had only a minor criminal record, demonstrated extraordinary post-offense rehabilitation and had suffered extreme abuse as a child." *Id.* at 23. As with the ineffective assistance of counsel claim relating to trial counsel, the *Strickland* standard applies. Royal must show both that resentencing counsel did not provide "reasonably effective assistance," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694.

First, ordinarily, the issue of ineffective assistance of counsel is not presented at sentencing and is not a recognized sentencing factor by statute or under the United States Sentencing Guidelines. *See* 18 U.S.C. § 3553(a) (listing the statutory factors to be considered at sentencing); *United States v. Martinez*, 136 F.3d 972, 980 (4th Cir. 1998) (noting that ineffective assistance of counsel is not a basis for a downward departure under the Sentencing Guidelines and noting that it is properly raised in a motion for a new trial, on direct appeal, or in a collateral challenge under 28 U.S.C. § 2255). Particularly where, as discussed above, trial counsel was not unconstitutionally ineffective in that the additional testimony that Royal believes should have been elicited would not have changed the outcome, there was nothing deficient about resentencing counsel's failure to invoke trial counsel's alleged ineffectiveness. Likewise, resentencing counsel's decision not to allow Royal to criticize his victims and other witnesses at resentencing not only did not constitute deficient performance, but it was a wise approach, as such statements only would have caused the Court to question Royal's personal characteristics, his level of acceptance of responsibility, and the quality of his post-sentence rehabilitation. *See Strickland*, 466 U.S. at 689 (stating that "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" in order to prove constitutionally deficient performance).

Second, even if resentencing counsel had taken the steps proposed by Royal, the Court would not have reached a different outcome. As discussed above, the alleged ineffectiveness of trial counsel centered on the failure to call certain witnesses, and those witnesses' proposed testimony largely related to certain incidents involving the use or distribution of marijuana. These specific incidents relating to marijuana were not necessary to the conviction on Count 6, which was also predicated on a conspiracy to distribute cocaine, and the total offense level, which was primarily based on the sex trafficking counts, was not affected by the quantity of marijuana at issue in this case. *See* Presentence Investigation Report ¶¶ 50-66.

More importantly, the failure to call such witnesses had little or no impact on the evidence relating to the sex trafficking charges and the drug distribution charges relating to cocaine and PCP that were the core of the case. With the most troubling incidents and conduct unaffected by the claims of ineffective assistance, the Court's assessment of the § 3553(a) factors, particularly the nature and circumstances of the offense and the need for the sentence to reflect the seriousness of the offense, provide just punishment, provide adequate deterrence, and protect the public from further crimes, would not have been altered by an argument that trial counsel could have offered the limited additional evidence from the identified witnesses. *See* 18 U.S.C. § 3553(a). Notably, any discussion of ineffective assistance of trial counsel would have done nothing to improve upon resentencing counsel's detailed presentation of the mitigating factors of Royal's difficult childhood and post-offense rehabilitation, which the Court considered significantly in reducing the total sentence by seven years. Finally, as discussed above, any criticism of the victims or witnesses by Royal at resentencing would have backfired and likely would have resulted in a higher sentence.

In the end, upon consideration of Royal's argument on ineffective assistance of resentencing counsel, the Court concludes that there was no deficient performance, and even if

resentencing counsel had taken the actions proposed by Royal, the Court would have imposed the same sentence, based on the same considerations described at the sentencing hearing. Where Royal has not shown deficient performance or prejudice, his claim of ineffective assistance of resentencing counsel fails, and the § 2255 Motion will be denied.

## IV.    Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant" in such cases. Because the accompanying Order is a final order adverse to the applicant, Royal must receive a certificate of appealability before an appeal may proceed. 28 U.S.C. § 2253(c)(1).

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner satisfies the standard by demonstrating that "jurists of reason could disagree with the district court's resolution of [the] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773-74 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). Here, the Court finds that Royal has not made the requisite showing. The Court therefore declines to issue a certificate of appealability. Royal may still request that the Fourth Circuit issue such a certificate. Fed. R. App. P. 22(b).

22

## CONCLUSION

For the foregoing reasons, Royal's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 will be DENIED.  The Court declines to issue a certificate of appealability.  A separate Order shall issue.


Date:  January 29, 2021



THEODORE D. CHUANG
United States District Judge